## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IMPERIAL TRADING CO., LLC, a Louisiana
Limited Liability Company                           Case No. _____

          Plaintiff,                                Hon. _____

v.

GERALD ABRAHAM, ALAN ABRAHAM,
GERALD ABRAHAM, in his capacity as
Trustee of the Gerald Abraham Trust dated
September 27, 1993, and ALAN ABRAHAM,
in his capacity as Trustee of the Alan Abraham
Trust dated June 27, 1993

          Defendants.

_____

## IMPERIAL TRADING CO., LLC'S COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff Imperial Trading Co., LLC ("Imperial"), for its complaint against Defendants Gerald Abraham, both individually and in his capacity as Trustee of the Gerald Abraham Trust dated September 27, 1993 ("Gerald's Trust"), and Alan Abraham, both individually and in his capacity as Trustee of the Alan Abraham Trust dated September 27, 1993 ("Alan's Trust"), alleges as follows:

### **<u>INTRODUCTION</u>**

1.      This is an action by Imperial to recover damages and contractual indemnification arising from fraud and material misrepresentations made by the Defendants in connection with the sale of three companies, GRAD Inc. ("GRAD"), S. Abraham & Sons, Inc. ("SAS"), and Superior Distribution Services, LLC ("SDS," and together with GRAD and SAS, sometimes referred to as the "Companies"), to Imperial.

**A.** **Imperial acquired all the stock of GRAD.**

2.      Imperial is a wholesale distributor that supplies convenience stores in the southeast region of the United States.

3.      On June 29, 2018, Imperial purchased all the stock of GRAD, a Michigan corporation.

4.      GRAD, a holding company, is the sole shareholder of SAS, a wholesale distributor headquartered in Grand Rapids, Michigan, that supplies convenience stores in the Midwest. SDS is a wholly-owned subsidiary of SAS.

5.      By its acquisition of the stock of GRAD, Imperial became, indirectly, the sole owner of both SAS and SDS.

6.      As a result of acquiring all of the outstanding stock of GRAD, Imperial and the Companies combined to become the fifth largest wholesale convenience store distributor in the United States.

**B.** **The Abraham family previously owned and operated SAS.**

7.      Prior to the sale, the Companies were owned and operated by members of the Abraham family, including the Defendants.

8.      GRAD was owned by Gerald's Trust, Alan's Trust, the Daniel Abraham Trust dated June 12, 1990, Stephen Abraham, and Jamie Deratany (collectively, the "Sellers").

9.      Gerald Abraham was the Senior Executive Vice President of SAS.

10.     Alan Abraham was the President of SAS.

11.     Alan Abraham's son, Philip Abraham, was employed by SAS as a district sales manager.

12.     Gerald Abraham's son, Stephen Abraham, was employed by SAS as the director of technology and information systems.

**C.     The sale was consummated pursuant to a Stock Purchase Agreement.**

13.     Imperial purchased the GRAD stock pursuant to a Stock Purchase Agreement executed as of June 7, 2018, as amended by a First Amendment to Stock Purchase Agreement dated June 29, 2018 (as amended, the "Stock Purchase Agreement"). The Stock Purchase Agreement is attached hereto as Exhibit 1.

14.     Imperial and the Sellers extensively negotiated the purchase price and the terms of the Stock Purchase Agreement for over six months.

15.     The Stock Purchase Agreement contained specific representations and warranties regarding the business of the Companies to ensure that Imperial would receive the business in the condition promised.

16.     The wholesale convenience store distribution business is a low-margin industry that requires a high volume of sales to maintain profitability. Success as a wholesale distributor requires strong relationships with customers who purchase goods in large volumes.

17.     The value of the Companies depended largely on the size of SAS's book of business and SAS's ability to continue supplying its customers after the acquisition.

18.     One of the essential representations and warranties of the Sellers in the Stock Purchase Agreement stated there had been no adverse changes to the relationships with SAS's largest customers since the date of the last financial statements provided by SAS.

19.     The Sellers represented in the Stock Purchase Agreement that, except as disclosed by Sellers in Schedule 3.12 attached to the Stock Purchase Agreement, since March 31, 2018, (a) no event had occurred that, "to Seller's Knowledge, has had, or is reasonably expected to have

. . . a MAE," and (b) that the Companies had not "received written, or to Sellers' Knowledge oral, notice from any customer that purchased more than $5,000,000 of goods and/or services from any one or more of the Companies within calendar year 2017 (i) terminating or cancelling its relationship with any Company or (ii) threatening to take any such actions, and, to Seller's [sic] Knowledge, none intends to do so." Schedule 3.12 is attached hereto as Exhibit 2.

20.     "MAE" is defined in the Stock Purchase Agreement as "a material adverse effect on the business, financial condition or results of operations of the Companies taken as a whole . . ."

21.     Imperial relied upon these representations in valuing the Companies, negotiating the purchase price and the terms of the Stock Purchase Agreement and agreeing to consummate the sale.

**D.      Two months after the closing, one of SAS's largest customers terminated its relationship with SAS.**

22.     Imperial and the Sellers performed their obligations under the Stock Purchase Agreement to purchase and sell the stock of GRAD on June 29, 2018, thus "closing" the stock purchase transaction on that date.

23.     Despite the Sellers' representations to the contrary, on June 28, 2018, the day before the closing of the Stock Purchase Agreement, SAS's Vice President of Sales and Marketing, George Bennett, approached the president of Imperial, Wayne Baquet, and expressed concerns about the possibility of losing the business of Walters-Dimmick Petroleum ("WDP"), one of SAS's largest customers.

24.     WDP accounted for over $45,000,000 in sales and 3.9% of SAS's total business in the twelve months prior to December 31, 2017.

25.     Alarmed by this news on the eve of closing, Wayne Baquet confronted Gerald Abraham and told him what George Bennett had said regarding SAS's relationship with WDP.

26.     Gerald Abraham assured Mr. Baquet that SAS's relationship with WDP was fine and that there was no cause for concern.

27.     Relying on Gerald Abraham's assurances, Imperial proceeded to close the Stock Purchase Agreement the next day for a purchase price of $83,000,000, subject to certain adjustments provided in the Stock Purchase Agreement.

28.     On August 31, 2018, only two months after Imperial purchased the Companies, WDP sent an email to SAS indicating its intent to terminate the sales relationship at the expiration of its contract term in November 2018.  WDP followed through and terminated the relationship in November.

29.     When Mr. Baquet told Gerald Abraham that WDP had terminated the relationship, Gerald Abraham admitted that WDP had been threatening to terminate the relationship since 2017, and that WDP was destined to get rid of SAS.

## PARTIES AND JURISIDICTION

30.     Imperial is a Louisiana limited liability company with its principal place of business in Elmwood, Louisiana.  Each of the members of Imperial are domiciled in Louisiana.

31.     Upon information and belief, Defendant Gerald Abraham is a resident of the state of Michigan.

32.     Upon information and belief, Alan Abraham is a resident of the state of Michigan.

33.     Upon information and belief, the Gerald Abraham Trust dated September 27, 1993 is domiciled in Michigan.

34.     Upon information and belief, the Alan Abraham Trust dated June 27, 1993 is domiciled in Michigan.

35.     This Court has jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

36.     This Court is a proper venue for this action under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this claim took place in this judicial district.

37.     Further the parties have contractually agreed that any action arising under the Stock Purchase Agreement between the parties shall be governed by Michigan law and filed and maintained only in the Circuit Court of Kent County, Michigan or the Federal District Court for the Western District of Michigan. The parties hereto have consented to the jurisdiction and venue of this Court and have irrevocably waived any objection based on improper venue or forum non conveniens.

## **BACKGROUND**

38.     As a result of SAS's substantial loss of business only months after the closing of the Stock Purchase Agreement, along with the contradictory statements made by Gerald Abraham before and after the sale regarding the status of SAS's relationship with WDP, Imperial began investigating the Sellers' potential breach of the representations and warranties contained in the Stock Purchase Agreement and/or fraud.

39.     While Imperial continues to investigate the extent of the Defendants' misrepresentations and fraud, the following facts are known to Imperial thus far.

40.     SAS's service contracts with its customers typically had a term of either three years or five years.

6

41.     In the eleven years prior to November 2017, SAS entered into multiple service contracts with WDP, all of them with a term of either three or five years.

42.     The most recent multi-year contract between SAS and WDP had a three-year term and was set to expire in November of 2017.

43.     In July of 2017, during the discussions to renew the contract, WDP informed SAS that it had serious concerns about the adequacy of SAS's IT Department and customer service, and that it had received a strong proposal from one of SAS's competitors, The H.T. Hackney Co. ("Hackney"), to acquire WDP's business.

44.     On July 27, 2017, George Bennett received an email from a representative of WDP questioning why WDP should remain with SAS, stating, "It is important for me to understand from another customer why to stay with SAS because while you continue to speak about customer service the actions of your team members have not made WDP a believer."

45.     Alan Abraham and Gerald Abraham were copied on the email from the WDP representative on July 27, 2017 and had knowledge of WDP's concerns and dissatisfaction with customer service.

46.     On information and belief, by July of 2017, the Sellers knew that they intended to sell the Companies in the near future and that the loss of WDP's business would significantly reduce the value of SAS and the price that the Sellers could obtain for the Companies.

47.     On information and belief, in an attempt to keep WDP's business, SAS sent WDP a proposal that included a five-year term, outlined how SAS would address some of the concerns raised by WDP, and offered unusually generous financial incentives to WDP to renew its contract with SAS.

48.     WDP was enticed by the financial incentives, but refused to enter into a new five-year contract with SAS. Instead, WDP agreed that it would only enter into a one-year extension of the contract due to its serious concerns regarding SAS's customer service and ability to navigate the convenience store industry.

49.     In its history, SAS had rarely, if ever, entered into a one-year service contract.

50.     On information and belief, SAS agreed to a one-year service contract so that it could maintain its relationship with WDP for that year and obtain a higher price for SAS.

51.     SAS understood that this one-year contract extension was a probationary period for it to address WDP's serious concerns and improve its services or WDP would follow through with its threat to terminate its relationship with SAS and move its business to SAS's competitor.

52.     SAS assigned Philip Abraham, the son of Alan Abraham, as the key account manager of the WDP account to oversee improvements in customer service.

53.     SAS assigned Stephen Abraham, the son of Gerald Abraham, to oversee improvements with the IT issues identified by WDP.

54.     SAS promised that Philip Abraham and Stephen Abraham would meet with members of WDP on a monthly basis.

55.     On or about September 19, 2017, WDP and SAS signed the one-year extension.

**E.     The Sellers immediately put SAS up for sale while neglecting SAS's promises to WDP.**

56.     In October of 2017, the month after SAS entered into the one-year probationary extension with WDP and promised to improve its services, the Sellers began to solicit bids for the sale of SAS.

57.     Imperial entered into a confidentiality agreement with SAS in October of 2017 to facilitate the disclosure of information regarding SAS's business and to commence negotiations of a potential sale of SAS to Imperial.

58.     While the Sellers were negotiating the sale of the Companies to Imperial, SAS was simultaneously neglecting to fulfill its promises to WDP, and the business relationship between SAS and WDP continued to deteriorate significantly.

59.     Neither Philip Abraham nor Stephen Abraham, recently placed in charge of the WDP relationship, were effective in improving the relationship with WDP.

60.     At a trade show in March of 2018, WDP informed George Bennett, SAS's Vice President of Sales, that Stephen Abraham had not shown up to a meeting in months and that the IT problems identified by WDP in July of 2017 had not been resolved.

61.     George Bennett reported to Alan Abraham and Gerald Abraham that Stephen Abraham had quit attending the monthly meetings with WDP and that WDP's IT problems were not being adequately addressed.

62.     Despite their knowledge that Stephen Abraham had failed to remedy the IT problems and had stopped attending the monthly IT meetings, the Defendants allowed Stephen Abraham to remain on WDP's account.

63.     In May of 2018, representatives of WDP expressed additional concerns to Philip Abraham, stating that they were dissatisfied with Stephen Abraham's level of service and that the IT problems still had not been addressed. Representatives of WDP even told Philip Abraham that WDP felt as if SAS no longer cared about WDP or its needs.

64.     On information and belief, SAS neglected WDP's needs because the Sellers were negotiating the sale of SAS, which was likely to close before the one-year extension with WDP expired.

65.     After May of 2018, WDP continued to express concerns to SAS about IT problems, SAS trucks arriving late, and ongoing customer service issues.

66.     SAS held weekly executive meetings attended by Gerald Abraham, Alan Abraham, Stephen Abraham, Philip Abraham, George Bennett, and Jim Leonard, the Vice President of Finance and Accounting.

67.     WDP's account was discussed at the executive meetings. The Defendants were well aware that WDP had expressed continued dissatisfaction with SAS's services during the one-year probationary extension, that the WDP contract was in jeopardy and that SAS did not push hard or firm enough on the SAS team to take WDP's complaints seriously.

**F.     The Sellers concealed the troubled relationship with WDP and made material misrepresentations in the Stock Purchase Agreement.**

68.     The Sellers did not, at any time during the negotiations or in the disclosure schedules to the Stock Purchase Agreement, disclose to Imperial that WDP had threatened to take its business elsewhere if SAS did not improve its services, that WDP had only entered into a one-year contract extension on a probationary basis, or that the relationship with WDP had continued to deteriorate during the probationary period.

69.     Rather, the Sellers listed WDP on Schedule 3.23 of the Stock Purchase Agreement as SAS's fourth largest customer responsible for over $45,000,000 in sales in 2017.  Schedule 3.23 is attached hereto as Exhibit 3.

70.     The Sellers represented in Section 3.12(a) of the Stock Purchase Agreement that since March 31, 2018, there had not been any "event, occurrence or development that, to Seller's Knowledge, has had, or is reasonably expected to have, individually or in the aggregate, a MAE."

71.     The Sellers represented in Section 3.12(n) of the Stock Purchase Agreement that neither SAS nor GRAD had "received written, or to the Sellers' Knowledge oral, notice from any customer that purchased more than $5,000,000 of goods and/or services from any one or more of the Companies within calendar year 2017 (i) terminating or cancelling its relationship with any Company or (ii) threatening to take any of such actions, and, to Seller's Knowledge, none intends to do so."

72.     Schedule 3.12 contained exceptions to Sellers representations, providing the Sellers with an opportunity to disclose any facts that may make the representations contained in Section 3.12(a) and (n) inaccurate or misleading.

73.     While choosing not to disclose the imminent loss of WDP's material business, the Sellers disclosed as a potential MAE on Schedule 3.12(a) that in February 2018 it entered into a three-year agreement with one of its significantly smaller customers, and that the customer had been or was going to be sold to a private equity firm.

74.     Similarly, instead of disclosing WDP's threats to terminate its business with SAS if SAS did not make significant improvements during the one-year probationary contract extension, on Schedule 3.12(n), Sellers only disclosed that, prior to June 7, 2018, another significantly smaller customer was sold to a third party, and that in connection with the sale, the customer had notified SAS that it was terminating its service contract.

75.     Sellers' disclosed relatively insignificant issues on Schedule 3.12 and intentionally concealed the more serious troubles with SAS's relationship with WDP.

76.     It was not until June 28, 2018, the day before the closing of the Stock Purchase Agreement that Wayne Baquet, president of Imperial, learned from George Bennett, an SAS executive that was not speaking for the Companies or the Sellers, that there may be a problem with the WDP account.

77.     Even then, when Wayne Baquet confronted Gerald Abraham on June 28, 2018 and asked if there were problems with the WDP account, Gerald Abraham intentionally misled Mr. Baquet and assured him that everything was normal with WDP. Gerald Abraham and the other Sellers made these misrepresentations to induce Imperial to purchase the Companies for an inflated price.

78.     At the closing the following day, on June 29, 2019, the Sellers again certified that the representations they had made in the Stock Purchase Agreement were true and correct as of that date.

79.     Roughly two months after Imperial purchased SAS, WDP sent notice that it was taking its book of business to SAS's competitor, Hackney, just as it said it would back in July of 2017.

80.     Only after the sale had closed and Imperial had paid the Sellers $83,000,000 did Gerald Abraham admit that the loss of WDP's business was inevitable due to problems that had persisted since at least 2017.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### (Breach of Contract for failure to indemnify losses caused by Defendants' breach of Section 3.12(a) of the Stock Purchase Agreement)

81.     Imperial re-alleges and incorporates the allegations contained in the preceding paragraphs.

82. Section 3.12(a) of the Stock Purchase Agreement provides:

> **3.12. Absence of Changes or Events**. Except as disclosed in Schedule 3.12 or as required or contemplated by this Agreement, since the Latest Financial Statement Date, other than in the ordinary course of business and other than the execution, delivery, and performance of this Agreement there has not been with respect to the Companies any:
>
> (a) event, occurrence or development that, to Seller's Knowledge, has had, or is reasonably expected to have, individually or in the aggregate, a MAE;

83. "MAE" is defined in the Stock Purchase Agreement as "a material adverse effect on the business, financial condition or results of operations of the Companies taken as a whole . . ."

84. "Seller's Knowledge" is defined in the Stock Purchase Agreement as "the actual knowledge of Alan [Abraham], Gerald [Abraham], and Jim Leonard as of the Effective Date, without a duty of inquiry."

85. The "Latest Financial Statement Date" is defined in the Stock Purchase Agreement as March 31, 2018.

86. The Sellers had actual knowledge that SAS had entered into a one-year contract extension on a probationary basis with WDP.

87. The Sellers had actual knowledge that SAS had made promises to WDP to improve its services during the one-year probationary period.

88. The Sellers had actual knowledge that, throughout the one-year probationary term, WDP continued to raise concerns with SAS's services and that SAS did not fulfill its promises to WDP.

89.     The Sellers had actual knowledge that SAS was destined to lose WDP's business at the end of the probationary period due to continued and persistent complaints from WDP during the one-year term.

90.     In or after March of 2018, George Bennett informed the Defendants that Stephen Abraham had discontinued attending the monthly IT meetings with WDP and that the IT issues with WDP's account had not been addressed.

91.     On or after March 31, 2018, WDP informed Philip Abraham that the IT problems persisted and that WDP felt as if SAS no longer cared about WDP or its needs.

92.     On or after March 31, 2018, WDP expressed additional concerns to SAS regarding continued IT problems, SAS trucks arriving late, and ongoing customer service issues.

93.      WDP's continued expressions of dissatisfaction with SAS's services and SAS's continued failure to meet WDP's needs constituted events, occurrences, or developments that, individually or in the aggregate, would likely lead to WDP's termination of its business relationship with SAS.

94.     The loss of WDP's $45,000,000 annual book of business had a material adverse effect on the business, financial condition and operations of SAS.

95.     Based on WDP's continued expressions of dissatisfaction after March 31, 2018 and SAS's continued failure to meet WDP's needs, the Defendants knew or reasonably expected that WDP would terminate its business relationship with SAS at the end of the one-year probationary period.

96.     The Sellers failed to disclose to Imperial that WDP had threatened to move its business to SAS's competitor in July of 2017.

97.    The Sellers failed to disclose to Imperial that WDP had only entered into a one-year probationary contract extension or that the one-year contract was an aberration from past contracts with WDP.

98.    The Sellers failed to disclose to Imperial that the service problems with WDP's account continued during the probationary period.

99.    Sellers never disclosed any information regarding SAS's relationship with WDP on Schedule 3.12(a) of the Stock Purchase Agreement.

100.    The Sellers breached the representations in Section 3.12(a) of the Stock Purchase Agreement by failing to disclose the issues with WDP in the disclosure schedules of the Stock Purchase Agreement.

101.    Imperial relied on Sellers' representations in negotiating the purchase price and terms of the Stock Purchase Agreement and agreeing to close the transaction on the negotiated terms.

102.    As a result of WDP's termination of its relationship with SAS, Imperial has sustained at least $12,298,718 in losses, plus costs and expenses including, without limitation, its attorneys' fees.

103.    The sole remedy for a breach of Sellers' representations and warranties and fraudulent misrepresentation under the Stock Purchase Agreement is indemnification pursuant to Section 10.2 which reads in pertinent part:

> Seller Indemnitors shall, jointly and severally, indemnify the Companies, Buyer and their respective shareholders, directors, employees, and agents (collectively, "**Buyer Indemnified Parties**") against, hold them harmless from and against, and pay and reimburse each of them for any losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of any kind . . . incurred by the Buyer Indemnified Parties, to the extent arising out of or related to . . . (a) Any breach

or inaccuracy in any representation or warranty made by Sellers in this Agreement. . . . (f) Any fraud by or on behalf of any Seller.

104.    "Seller Indemnitors" is defined in the Stock Purchase Agreement as Alan's Trust, Gerald's Trust, Alan Abraham, and Gerald Abraham. Each of the Defendants is a Seller Indemnitor.

105.    $6,800,000 of the purchase price paid by Imperial was deposited into an Indemnity Escrow Account at closing to be used for the payment of indemnity claims submitted by Imperial.

106.    Section 10.6 of the Stock Purchase Agreement requires Imperial to first proceed against the indemnity escrow amount with respect to losses sustained by Imperial as result of the Sellers' breaches.

107.    On or about November 14, 2018, Imperial sent to the Sellers and the escrow agent a notice of indemnity claim for breach of representations and warranties, demanding payment of the entire balance of the Indemnity Escrow Account.

108.    Sellers have submitted a counter notice to the escrow agent objecting to Imperial's indemnity claim and refusing to indemnify Imperial for their breaches of representations and warranties.

109.    The Sellers breached the Stock Purchase Agreement by failing to indemnify Imperial for its losses arising from Sellers' breach of Section 3.12(a) of the Stock Purchase Agreement.

110.    The Stock Purchase Agreement requires a court of competent jurisdiction to render judgment requiring payment of the indemnity escrow amount to Imperial.

## SECOND CAUSE OF ACTION
### (Breach of Contract for failure to indemnify losses caused by Defendants' breach of Section 3.12(n) of the Stock Purchase Agreement)

111.    Imperial re-alleges and incorporates the allegations contained in the preceding paragraphs.

112.    Section 3.12(n) of the Stock Purchase Agreement provides:

> **3.12.   Absence of Changes or Events**. Except as disclosed in Schedule 3.12 or as required or contemplated by this Agreement, since the Latest Financial Statement Date, other than in the ordinary course of business and other than the execution, delivery, and performance of this Agreement there has not been with respect to the Companies any:
> ...
>
> (n)    no Company has received written, or to Sellers' Knowledge oral, notice from any customer that purchased more than $5,000,000 of goods and/or services from any one or more of the Companies within calendar year 2017 (i) terminating or cancelling its relationship with any Company or (ii) threatening to take any such actions, and, to Seller's [sic] Knowledge, none intends to do so.

113.    "Seller's Knowledge" is defined in the Stock Purchase Agreement as "the actual knowledge of Alan [Abraham], Gerald [Abraham], and Jim Leonard as of the Effective Date, without a duty of inquiry."

114.    The "Latest Financial Statement Date" is defined in the Stock Purchase Agreement as March 31, 2018.

115.    The Defendants had actual knowledge that in July of 2017 SAS had threatened to move its business to a competitor of SAS due to serious problems with SAS's customer service and IT services.

116.    In July 2017, George Bennett, Alan Abraham, and Gerald Abraham received an email from a representative of WDP questioning why WDP should remain with SAS and stating

that "while you continue to speak about customer service the actions of your team members have not made WDP a believer."

117.    The Sellers failed to disclose to Imperial that WDP had threatened to move its business to SAS's competitor in July of 2017.

118.    The Sellers failed to disclose to Imperial that WDP had only entered into a one-year probationary contract extension or that the one-year contract was an aberration from past contracts with WDP.

119.    The Sellers failed to disclose to Imperial that the service problems with WDP's account continued during the probationary period.

120.    The Sellers had actual knowledge that WDP intended to terminate its relationship with SAS if SAS did not meet WDP's needs.

121.    The Sellers had actual knowledge that SAS was failing to meet WDP's needs.

122.    The Sellers were given written or oral notice that WDP had threatened to terminate or cancel its relationship with SAS.

123.    The Sellers breached the representations in Section 3.12(n) of the Stock Purchase Agreement by failing to disclose the issues with WDP in the disclosure schedules of the Stock Purchase Agreement.

124.    Imperial relied on Sellers' representations in negotiating the purchase price and terms of the Stock Purchase Agreement and agreeing to close the transaction on the negotiated terms.

125.    As a result of WDP's termination of its relationship with SAS, Imperial will sustain at least $12,298,718 in losses, plus costs and expenses including, without limitation, its attorneys' fees.

126.    The sole remedy for a breach of Sellers' representations and warranties and fraudulent misrepresentation under the Stock Purchase Agreement is indemnification pursuant to Section 10.2 which reads in pertinent part:

> Seller Indemnitors shall, jointly and severally, indemnify the Companies, Buyer and their respective shareholders, directors, employees, and agents (collectively, "**Buyer Indemnified Parties**") against, hold them harmless from and against, and pay and reimburse each of them for any losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of any kind . . . incurred by the Buyer Indemnified Parties, to the extent arising out of or related to . . . (a) Any breach or inaccuracy in any representation or warranty made by Sellers in this Agreement. . . . (f) Any fraud by or on behalf of any Seller.

127.    "Seller Indemnitors" is defined in the Stock Purchase Agreement as Alan's Trust, Gerald's Trust, Alan Abraham, and Gerald Abraham. Each of the Defendants is a Seller Indemnitor.

128.    $6,800,000 of the purchase price paid by Imperial was deposited into an Indemnity Escrow Account at closing to be used for the payment of indemnity claims submitted by Imperial.

129.    Section 10.6 of the Stock Purchase Agreement requires Imperial to first proceed against the indemnity escrow amount with respect to losses sustained by Imperial as result of the Sellers' breaches.

130.    On or about November 14, 2018, Imperial sent to the Sellers and the escrow agent a notice of indemnity claim for breach of representations and warranties, demanding payment of the entire balance of the Indemnity Escrow Account.

131.    Sellers have submitted a counter notice to the escrow agent objecting to Imperial's indemnity claim and refusing to indemnify Imperial for their breaches of representations and warranties.

132.     Sellers breached the Stock Purchase Agreement by failing to indemnify Imperial for its losses arising from Sellers' breach of Section 3.12(n) of the Stock Purchase Agreement.

133.     The Stock Purchase Agreement requires a court of competent jurisdiction to render judgment requiring payment of the indemnity escrow amount to Imperial.

### THIRD CAUSE OF ACTION
### (Breach of Contract for failure to indemnify losses caused by Defendants' fraud)

134.     Imperial re-alleges and incorporates the allegations contained in the preceding paragraphs.

135.     The Stock Purchase Agreement provides that the Defendants are jointly and severally liable to Imperial for losses due to the fraud of any Seller:

> **10.2.   Indemnification by Seller Indemnitors**.  Subject to the other provisions of this Article X, Seller Indemnitors shall, jointly and severally, indemnify the Companies, Buyer and their respective shareholders, directors, employees and agents (collectively, "**Buyer Indemnified Parties**") against, hold them harmless from and against, and pay and reimburse each of them for any and all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards penalties, fines, costs or expenses of whatever kind (including without limitation, reasonable attorneys' fees) (individually and collectively, "Losses") incurred by the Buyer Indemnified Parties, to the extent arising out of or related to the following (collectively, the "**Buyer Indemnified Losses**"):
> . . .
>> (f)       Any fraud by or on behalf of any Seller; . . .

136.     The Stock Purchase Agreement further provides that the amount of damages arising from fraud is not subject to a cap of $8,500,000:

> **10.5   Limitations on Indemnity**.  Notwithstanding any other provision in this Agreement: . . .
>
> (d)       No Seller Indemnitor shall have any liability for indemnification pursuant to Section 10.2(a), once the aggregate amount of Buyer Indemnified Losses indemnified by Seller

Indemnitors with respect to such claims exceeds Eight Million Five Hundred Thousand Dollars ($8,500,000) (the "**Cap Amount**"); provided, however, that the foregoing limitation shall not apply with respect to any such Losses arising from or related to, fraud or breaches of the Fundamental Representations, and provided further that in no event shall the liability of Seller Indemnitors with respect to Buyer Indemnified Losses (in the aggregate) exceed the Purchase Price. . . .

137. The day before the closing of the Stock Purchase Agreement, on or about June 28, 2018, SAS's Vice President of Sales and Marketing, George Bennett, informed Imperial President, Wayne Baquet, that he had concerns that SAS was going to lose WDP's business due to ongoing service issues.

138. That same day, Wayne Baquet asked Gerald Abraham about the status of the WDP account.

139. Gerald Abraham told Wayne Baquet that there were no issues with the WDP account and that SAS was in a typical bid process with WDP.

140. Gerald Abraham knew that SAS entered into a one-year contract extension with WDP on a probationary basis and that WDP intended to terminate its relationship with SAS at the end of the probationary period.

141. Gerald Abraham intentionally misled Wayne Baquet about the status of SAS's relationship with WDP on the day before the closing of the Stock Purchase Agreement to induce Imperial to consummate the sale.

142. Gerald Abraham concealed the problems with WDP and his knowledge that WDP would likely terminate its relationship with SAS so that Imperial would pay a higher price for the stock of GRAD, to the benefit of the Sellers.

143.    Wayne Baquet relied on Gerald Abraham's false statements regarding the WDP account in deciding to close the Stock Purchase Agreement the following day.

144.    After the Stock Purchase Agreement closed and WDP had terminated its relationship with SAS, Gerald Abraham admitted that WDP had been threatening to leave SAS since 2017 and that WDP was destined to get rid of SAS.

145.    Imperial's reliance on Gerald Abraham's intentional misrepresentations caused Imperial to suffer at least $12,298,718 in losses, plus costs and expenses including, without limitation, its attorneys' fees.

146.    Imperial's losses arise from and relate to Gerald Abraham's fraudulent misrepresentations regarding SAS's relationship with WDP and therefore are not subject to the $8,500,000 cap on damages.

147.    On or about November 14, 2018, Imperial sent to Sellers and the escrow agent a notice of indemnity claim, demanding payment of the entire balance of the Indemnity Escrow Account.

148.    Sellers have submitted a counter notice to the escrow agent objecting to Imperial's indemnity claim and refusing to indemnify Imperial for Sellers' misrepresentations and failure to disclose material information.

149.    Sellers breached the Stock Purchase Agreement by failing to indemnify Imperial for its losses arising from the Sellers' fraud.

150.    The Stock Purchase Agreement requires a court of competent jurisdiction to render judgment requiring payment of the indemnity escrow amount to Imperial

151.    The Defendants are jointly and severally liable to Imperial for the damages arising from Gerald Abraham's fraud.

## PRAYER FOR RELIEF

WHEREFORE, Imperial prays that the Court enter a judgment in favor of Imperial and against the Defendants as follows:

152.    For all losses Imperial has incurred and/or will incur, including attorneys' fees, defense and related costs, as a result of the Sellers' breach of contract and fraud as alleged herein, according to proof at trial;

153.    For an order deciding that the Escrow funds be dispersed to Imperial.

154.    For prejudgment interest at the legal rate on the foregoing sums; and

155.    For such other and further relief as deemed appropriate and just by the Court.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Imperial hereby demands a trial by jury of all issues properly triable thereby.

Dated:      August 7, 2019                           Respectfully submitted,


                                                     /s/ Kristina M. Araya
                                                     Kristina M. Araya (P74507)
                                                     Kelsey M. Dame (P82044)
                                                     WARNER NORCROSS + JUDD LLP
                                                     111 Lyon, N.W., Suite 900
                                                     Grand Rapids, Michigan 49503
                                                     616.752.2000
                                                     karaya@wnj.com
                                                     kdame@wnj.com
                                                     Attorneys for Plaintiff